# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-893V
UNPUBLISHED

|  |  |
|---|---|
| KYLE BOLICK,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: October 19, 2023 |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for Petitioner.*

*Kimberly Shubert Davey, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CASE[1]

On July 23, 2020, Kyle Bolick filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table injury – specifically, that he suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine on November 8, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters ("SPU").

As discussed below, dismissal of Petitioner's Table SIRVA claim is warranted, since the record does not substantiate that Petitioner likely suffered limited or reduced

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

range of motion, as required to demonstrate a SIRVA claim under the Vaccine Injury Table. Petitioner will, however, be given an opportunity to establish an "off-Table" claim, based on the same facts.

## I.   Relevant Procedural History

As noted above, this case was initiated in July 2020. On January 18, 2022, after attempting to resolve this case informally, Petitioner filed a status report stating that the parties had reached an impasse,[3] and requesting that the parties brief this matter for my resolution. ECF No. 38. I agreed and set the proposed schedule.

On February 17, 2022, Petitioner filed a Motion for Ruling on Record. ECF No. 39. On March 8, 2022, Respondent filed his Rule 4(c) Report and Response to Petitioner's Motion, recommending that entitlement to compensation be denied under the terms of the Vaccine Act. ECF No. 40. Respondent argued that Petitioner had failed to establish that he suffered the Table injury of SIRVA, because (a) Petitioner has not established that the onset of his shoulder symptoms began within 48 hours of his vaccination, and (b) Petitioner has not established that he suffered limited range of motion. ECF No. 40 at 6-7 (citing 42 C.F.R. § 100.3(c)(10)).[4] Petitioner filed a Reply brief on March 23, 2022. ECF No. 42.

## II.   Relevant Factual History

I have reviewed all evidence filed to date, but limit my discussion below to those items most relevant to the disputed onset and range of motion questions. 42 C.F.R. § 100.3(c)(10); 42 C.F.R. § 100.3(a)(XIV)(B).

### A.  Medical Records

- On November 8, 2018, Petitioner received a flu vaccine, administered to his left deltoid (shoulder), at his place of employment. Ex. 1 at 2.

- On November 24, 2018, Petitioner was seen in urgent care, reporting a four-week history of congestion and a cough. He was diagnosed with "[a]cute bacterial

---

[3] I previously had encouraged the parties' to informally resolve this case, noting that although an initial, cursory view of the record suggested that Petitioner had not experienced reduced range of motion (as required to establish a SIRVA Table case), resolution of the issue presented litigative risk to both parties. ECF No. 25.

[4] Respondent further argued that Petitioner cannot establish an off-Table claim for his alleged shoulder injury under the relevant standard. ECF No. 40 at 8-10.

sinusitis" and prescribed doxycycline and Bromfed-DM to treat his illness. Ex. 10 at 91-92

- On November 27, 2018 (19 days post-vaccination), Petitioner presented to orthopedist, John Ternes, MD, with a chief complaint of a three-week history of left shoulder pain. Ex. 2 at 12. Dr. Ternes history noted that petitioner had "a chief complaint of left lateral shoulder pain secondary to a flu injection given on 11/08/2018." *Id.* The history further indicates that "a few days after the injection he noted *continued* soreness in the shoulder. The soreness has persisted for him." *Id.* (emphasis added). Petitioner further reported that "[r]eaching overhead and behind his back increases his discomfort." *Id.*

  A "Patient Portal Orthopedic Form" corresponding to Petitioner's November 27, 2018 visit, explicitly describes various aspects of Petitioner's pain. *Id.* at 11. It also provides "experiencing symptoms – Nov 8th 2018." *Id.*

  Dr. Ternes's physical examination findings included: "point tenderness on palpation of the lateral subacromial area but no biceps tendon tenderness. The *left shoulder had a full range of motion* with no crepitus. Impingement sign was positive. There was no anterior, inferior, or posterior instability of the shoulder." *Id.* at 12 (emphasis added).

  Dr. Ternes's impression was that Petitioner had left shoulder impingement syndrome. *Id.* Dr. Ternes indicted that Petitioner's "injection was likely given into the subacromial space and has cause[d] an inflammation of his bursa." *Id.* Petitioner was given information pertaining to shoulder bursitis, prescribed diclofenac, and provided with a sheet of exercises to be performed with a Thera-Band (also provided). *Id.* Administration of a steroid injection was also discussed, but Petitioner wanted to wait on that treatment option. *Id.*

- Four months later, on March 28, 2019, Petitioner returned to see Dr. Ternes "for follow-up of his left shoulder impingement syndrome." Ex. 2 at 7. A history provides that the prescribed diclofenac medication "help[ed] his discomfort. He is now sleeping better. He still notes an intermittent positional discomfort at the lateral and posterior lateral aspect of his shoulder with overhead reaching and reaching behind his back." *Id.* Petitioner further indicated that "he fe[lt] he ha[d] plateaued with still some residual discomfort." *Id.*

  Dr. Ternes's physical examination findings included: "tenderness on palpation of the lateral subacromial area. There was no biceps tendon tenderness. The *left*

*shoulder had a full range of motion* with subacromial discomfort at the end of forward flexion and internal rotation. Impingement sign was trace positive." *Id.* (emphasis added).

Dr. Ternes's impression remained left shoulder impingement syndrome, and he administered a steroid injection to treat Petitioner's left shoulder symptoms. *Id.*

- Nearly two months later, on May 23, 2019, Petitioner returned to see Dr. Ternes for a follow-up visit in regard to his left shoulder pain. Dr. Ternes's history provides that Petitioner reported that the steroid injection he had received at his prior visit had "completely resolved his shoulder discomfort until about 3 weeks ago." Ex. 2 at 5. Petitioner specifically "noted a gradual recurrence of the discomfort in his lateral left shoulder primarily with sleeping and reaching across his body." *Id.*

Dr. Ternes's physical examination findings noted "tenderness on palpation of the lateral subacromial area but no biceps tendon tenderness. The *shoulder had a full and active and passive range of motion* with subacromial discomfort at the end of forward flexion and internal rotation. There was no crepitus on this range of motion." *Id.* (emphasis added).

Dr. Ternes's impression remained left shoulder impingement syndrome and indicated "that it is possible he has a recurrence of the bursitis or a partial thickness rotator cuff tear." *Id.* Various treatment options were discussed, and Petitioner indicated he would continue to treat with aspirin and would try a course of physical therapy. *Id.* Additionally, Petitioner elected to receive, and was administered, another steroid injection to treat his injury. *Id.*

- No further medical records address Petitioner's alleged vaccine related shoulder pain.

### B. Petitioner's Declaration

Petitioner filed a detailed signed declaration or statement (titled as an "affidavit") on July 31, 2020, describing his vaccination, subsequent treatment, and pain and suffering in detail. Ex. 3.[5] Petitioner states he suffered pain in his left shoulder immediately following his vaccination. Ex. 3, ¶ 4.

---

[5] I observe that Petitioner's statement was not notarized as an affidavit would be, but was signed by Petitioner "under penalty of perjury" on July 22, 2020. Ex. 3 at 7.

Petitioner states that prior to his vaccination he "never had any pain or issues with range of motion in this left shoulder." Ex. 3, ¶ 2. Petitioner indicates that in the days following his vaccination he "was in immense pain." *Id.* at ¶ 6. Among other difficulties, he "could not lift his pillow to move it during the night," nor could he lift his children, or drive because extending his arm "caused a lot of pain." *Id.* at ¶¶ 6, 9. Additionally, Petitioner could not golf as "I could not contemplate swinging a club with how much left shoulder pain I was experiencing." *Id.* ¶ 10. Petitioner describes how even as his symptoms began to improve, he continued to be unable to lift or hold his daughters comfortably, and he experienced pain with routine tasks such as dressing. *Id.* at ¶ 12.

Petitioner indicates that after his third visit with Dr. Ternes (occurring more than six months after his vaccination), he elected not to pursue physical therapy as his family was already suffering financial stress (explaining his wife was diagnosed with cervical cancer during her pregnancy the summer before his vaccination). Therefore, Petitioner made the determination to "grin and bear my shoulder pain and forgo physical therapy." *Id.* at ¶ 13-14. At the time he submitted his declaration in July 2020, Petitioner indicated that his left shoulder continued to give him trouble. He stated his golf game was "affected permanently" as the "swinging motion seems to cause flare ups," and he now lives a "new normal" avoiding activities that trigger the pain. *Id.* at ¶ 15.

### III.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25,

1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8; *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C. F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (*e.g.* tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## IV. Findings of Fact

### A. Onset

The first disputed issue is whether Petitioner experienced the onset of his pain within 48 hours of his November 8, 2018 vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii).

As Respondent correctly points out, Petitioner first received treatment for his shoulder pain 19 days after his vaccination, indicating to Dr. Ternes "*a few days* after the injection he noted continued soreness in the shoulder." ECF No. 40 at 6 (citing Ex. 2 at 12)(emphasis in original). Then, at Petitioner's interim urgent care visit on November 24, 2018, Petitioner did not report he suffered shoulder pain despite alleging he suffered immediate shoulder pain following his vaccination. *Id.* (citing Ex. 10 at 92). Thus, there is some initial, close-in-time evidence suggesting an onset outside the Table timeframe.

However, I observe that Petitioner's November urgent care visit was for an *acute infection*. Ex. 10 at 91-92. It is reasonable to conclude that Petitioner's focus at this treater visit was on that medical concern, and not others (even if they also existed at the time). Petitioner was subsequently seen by an orthopedist (who could better address his continued shoulder pain) only three days later, after this urgent care visit. Ex. 2 at 12. Thus, while one intervening record omits mention of shoulder pain, a record not long thereafter evidences treatment for just that very medical concern.

In addition, Petitioner accurately notes that he did not relate the onset of shoulder pain or soreness as occurring a few days after his vaccination, but instead complained of "*continued* soreness in the shoulder." ECF No. 42 at 3 (citing Ex. 2 at 12) (emphasis in original). This implies an onset temporally close to vaccination. And the history contained in Dr. Ternes's November 27, 2018 record describes Petitioner as having presented with "a chief complaint of left lateral shoulder pain secondary to a flu injection given on 11/08/2018." Ex. 2 at 12. Additionally, a "Patient Portal Orthopedic Form" corresponding to Petitioner's November 27, 2018 visit, explicitly records "experiencing symptoms – Nov 8th 2018." *Id.* at 11.

In sum, while the most immediately contemporaneous record (the urgent care records from November 24, 2018) does not support a finding of Table onset with specificity (although it does not negate it), those records are outweighed by Dr. Ternes' *orthopedic* records from November 27, 2018 (only three days later) which preponderantly support Petitioner's assertion that his shoulder pain began immediately following his flu vaccination. The totality of the evidence therefore preponderantly supports the conclusion that Petitioner's shoulder pain likely began within 48 hours of his vaccination, meaning the Table onset requirement has been satisfied. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii).

## B. Limited Range of Motion

Respondent's next objection in this case is that Petitioner cannot establish that he suffered limited range of motion – a requirement (Respondent argues) to establish a SIRVA claim under the Vaccine Injury Table. This objection has far more evidentiary and legal support.

### 1. Whether Limited Range of Motion is a QAI requirement to establish a Table SIRVA.

A preliminary question is whether a petitioner must specifically establish that he suffered limited range of motion following vaccination *at all,* to satisfy the QAI requirements for a SIRVA Table claim.[7] 42 C.F.R. § 100.3(c)(10). I have previously observed that the SIRVA QAI language is somewhat ambiguous in this regard. *Dawson v. Sec'y of Health & Hum. Servs*., No. 19-278V, 2021 WL 5774655, at *2-3 (Fed. Cl. Spec. Mstr. Nov. 4, 2021). But now, having looked more closely at the question, I conclude that this is plainly a Table element for this kind of claim.

Pursuant to Section 14(c) of the Vaccine Act, Congress delegated to Respondent the authority to "promulgate regulations" to modify the Vaccine Injury Table. In 2017, SIRVA was added to the Vaccine Injury Table by Respondent as an injury following the administration of certain vaccines. National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 82 FR 6294-01 (January 19, 2017). As previously discussed in another case analyzing the SIRVA QAI requirements:

> The starting point for analyzing the respondent's regulations begins if "there is [an] express delegation of authority [by Congress] to an agency to elucidate a specific provision of the statute by regulation. *Chevron U.S.A.,*

---

[7] Although Petitioner does not in his briefing directly dispute that reduced range of motion must be demonstrated in order for a Petitioner to demonstrate a Table SIRVA claim, in an earlier-filed Status Report he did make that argument. ECF No. 32 at 1-2.

*Inc., v. Nat'l Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984). When granting rulemaking power to agencies, Congress usually intends to give them considerable latitude to interpret the ambiguous rules they issue. *Kisor v. Wilkie,* 139 S.Ct. 2400, 2412 (2019). Before concluding that a rule is genuinely ambiguous, a court must exhaust all the "traditional tools" of construction. *Kisor v. Wilkie,* at 2415 (citing *Chevron* at 843 n.9). If a genuine ambiguity remains, moreover, the agency's reading must still be reasonable. 139 S.Ct. at 2416; *Thomas Jefferson Univ. v. Shalalala,* 512 U.S. 504, 515 (1994). However, if uncertainty does not exist, there is no plausible reason for *Auer* deference and "the regulation just means what it means." *Kisor* at 2415.

*A.P. v. Sec'y of Health & Hum. Servs*., No. 17-784V, 2022 WL 275785, at *13 (Fed. Cl. Spec. Mstr. Jan. 31, 2022) (finding that only vaccines intended for administration intramuscularly could be the basis for a SIRVA Table claim).

Traditional tools of statutory construction provide that the starting point for understanding a provision is the plain meaning of the text. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (citations omitted). Here, the QAI for SIRVA discusses "limited range of motion" in two places. First, the introductory paragraph defining SIRVA states that it "manifests as shoulder pain *and limited range of motion* occurring after the administration of a vaccine intended for intramuscular administration in the upper arm." 42 C.F.R. § 100.3(c)(10) (emphasis added). The verb "manifest" is defined as "to make evident or certain by showing or displaying."[8] This phrasing supports Respondent's argument that range of motion limits must be demonstrated – not only pain.[9]

Second, a specific SIRVA element provides that "[a] vaccine recipient shall be considered to have suffered SIRVA if such recipient *manifests* all of the following: . . . (iii) Pain *and reduced range of motion* are limited *to* the shoulder in which the intramuscular vaccine was administered; . . . ." 42 C.F.R. § 100.3(c)(10). This subsection

---

[8] Merriam-Webster, https://www.merriam-webster.com/dictionary/manifest (last visited October 19, 2023).

[9] I observe that although the word "and" can be conjunctive or disjunctive, "[t]he usual meaning of the word 'and,' however, is conjunctive, and 'unless the context dictates otherwise, the 'and' is presumed to be used in its ordinary sense....'" *Reese Bros. v. United States*, 447 F.3d 229, 235–36 (3d Cir. 2006) (citing *Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1332 (11th Cir.2005); *see also OfficeMax, Inc. v. United States,* 428 F.3d 583, 588 (6th Cir.2005), *r'hrg en banc denied,* No. 04–4009, 2006 U.S.App. LEXIS 8294 (6th Cir. March 30, 2006) (citing in part *Crooks v. Harrelson,* 282 U.S. 55, 58, 51 S.Ct. 49, 75 L.Ed. 156 (1930); Webster's Third New International Dictionary 80 (2d ed.2002); 1A Norman J. Singer, Statutes and Statutory Construction 21.14, at 179–80 (6th ed.2002))). Petitioner has not argued that the usual conjunctive meaning of the word "and" should not apply in this context.

arguably could be understood to only to define the *locus* of a petitioner's reduced range of motion ("the shoulder in which the intramuscular vaccine was administered"), and not that proof of reduced range of motion is a specific injury element. However, when 42 C.F.R. § 100.3(c)(10)(iii) is read in conjunction with the introductory paragraph of the SIRVA QAI definition (which identifies **both pain *and* limited range of motion** as characteristics of a SIRVA), it is more likely that a Petitioner must demonstrate both (albeit only in the shoulder in which the vaccine was administered).

The foregoing can be contrasted against a different Table element, where range of motion references are omitted. Specifically, the second QAI element states that a claimant must prove that "[p]ain occurs within the specified time-frame." 42 C.F.R. § 100.3(c)(10)(ii). This element makes no reference to range of motion occurring within a specified time-frame – and in prior special master decisions, it has been interpreted to require *only* proof of pain in the 48-hour period post-vaccination. *Robuck v. Sec'y of Health & Hum. Servs.*, No. 20-0465V, 2023 WL 6214986, at *6 (Fed. Cl. Aug. 21, 2023). Thus, Respondent drafted QAI language applicable to only one SIRVA characteristic where it so intended – highlighting the importance of the *inclusion* of range of motion references elsewhere in this regulation.

Accordingly, after examining 42 C.F.R. § 100.3(c)(10) as a whole, I find it clear that the QAI definition for a SIRVA injury requires that a Petitioner demonstrate they suffered both pain and limited or reduced range of motion following receipt of a covered vaccine.

### 2. Whether Petitioner Manifested or Exhibited Limited Range of Motion

Respondent argues that Petitioner failed to exhibit limited range of motion in this case, specifically pointing to the three (and only) physical examinations conducted of Petitioner's left shoulder. ECF No. 40 at 6-7. As discussed in Section II above, Petitioner's orthopedist, Dr. Ternes, found (following each of Petitioner's physical examinations occurring on November 27, 2018, March 28, 2019, and May 23, 2019) that Petitioner had "full" range of motion. Ex. 2 at 5, 7, 12. Thus, Respondent argues that over the entirety of his six-month treatment course, Petitioner manifested full range of motion. ECF No. 40 at 6-7.

Petitioner attempts to rebut this contention, maintaining that his medical records establish he demonstrated "functionally limited range of motion due to pain." ECF No. 42 at 6. Petitioner cites the following records and his declaration as evidence in support:

- 11/27/2018: Petitioner's report to Dr. Ternes that "[r]eaching overhead and behind his back increases his discomfort." Ex. 2 at 12;

- 3/28/2019: Petitioner's report to Dr. Ternes that he "still notes an intermittent positional discomfort at the lateral aspect of his shoulder with overhead reaching and reaching behind his back." *Id.* at 7;

- 5/23/2019: Petitioner's report to Dr. Ternes that he "noted a gradual recurrence of the discomfort in his left lateral shoulder primarily with sleeping and reaching across his body." *Id*. at 5; and

- Petitioner's statements in his signed declaration that following his vaccination he "could not lift [his] children," his pillow, or drive "with [his] left arm because extending [his] arm to the height of the steering wheel caused a lot of pain." Ex. 3 at 2-3. He also asserts that he was unable to play golf, as he "could not even contemplate swinging a club with how much shoulder pain I was experiencing." *Id*. at 4.

ECF No. 42 at 6-7.

The above records demonstrate that Petitioner experienced pain and discomfort in his shoulder with motion – but that is not the equivalent to demonstrating limited range of motion. This is especially true when Petitioner received medical treatment on only three occasions, and at each of these three medical visits Petitioner was found after a physical examination of his left shoulder to demonstrate "full" range of motion. The fact that Petitioner experienced pain with motion is not equivalent to him being unable to move the affected arm/shoulder fully. While I agree with Petitioner that his shoulder examinations were not normal in a general sense (ECF No. 42 at 7), Dr. Ternes's specific findings clearly establish that Petitioner exhibited complete range of motion, albeit with pain. Ex. 2 at 12 (Dr. Ternes finding "left shoulder had a full range of motion with no crepitus" on November 27, 2018); Ex. 2 at 7 (Dr. Ternes finding "full range of motion with subacromial discomfort at the end of forward flexion and internal rotation" on March 28, 2019); Ex. 2 at 5 (Dr. Ternes finding "full and active and passive range motion with subacromial discomfort at the end of forward flexion and internal rotation" on May 23, 2019.)

Petitioner also appears to argue in his briefs that his diagnoses or findings of bursitis, a positive impingement sign, and impingement syndrome support that he suffered reduced range of motion, and more generally a SIRVA Table injury. ECF No. 39 at 12-13,16; ECF No. 42 at 6. As a preliminary matter, I concur with Respondent that Petitioner was not technically diagnosed or assessed with bursitis. ECF No. 40 at 9-10. Nor was there any MRI evidence in this case. However, as pointed out by Petitioner, Dr. Ternes certainly diagnosed Petitioner with "[l]eft shoulder impingement syndrome" and

"advised that the injection was likely given into the subacromial space and has cause[d] an inflammation of his bursa." ECF No. 42 at 6; Ex. 2 at 12. Petitioner was also provided information on shoulder bursitis. *Id.* Likewise, Petitioner is correct that symptoms of bursitis generally include limited motion, and that these specific injuries were considered and discussed when Respondent proposed adding SIRVA to the Vaccine Injury Table. ECF No. 39 at 13-14; ECF No. 42 at 6, n.7. And shoulder bursitis and impingement syndrome are diagnoses seen in many Table SIRVA claims. However, Petitioner does not meet the QAI criteria for a SIRVA by demonstrating these diagnoses – he must instead *prove* preponderantly both pain and limited range of motion, but can only establish the former based on this record.

Petitioner further argues that my decision in *Dawson* supports a finding in the instant case that Petitioner suffered a functionally limited range of motion. ECF No. 42 at 8-9. However, the standard I utilized in *Dawson* was not whether Petitioner exhibited *functionally* limited range of motion – but whether the petitioner exhibited *limited* range of motion. In *Dawson*, while I observed "on numerous occasions Petitioner exhibited good or full range of motion," I further found that the *Dawson* petitioner's medical records documented both objective and subjective evidence that the petitioner had exhibited limited range of motion. *Dawson*, 2021 WL 5774655, at *3-4. That evidence included:

> complaints of "pain + limited ROM [with] L[eft] shoulder in upward mot[ion]." Ex. 3 at 11. HSU reported that Petitioner had "[f]ull ROM bilateral arms + R[ight] shoulder."[10] *Id.* (*emphasis added*). This same record contains an objective "musculoskeletal" assessment which indicated that Petitioner's "problem location" was noted to be his left shoulder and a box was checked indicating "ROM limitations." *Id.* at 12.
>
> Further, objective evidence is found in Petitioner's MRI order and report, both of which document that Petitioner required a left shoulder MRI due to his left shoulder pain and decreased range of motion. Ex. 3 at 37, Ex. 5 at 9.

*Id.* at *4. In the instant case, by contrast, there is no objective or subjective evidence that Petitioner *ever* suffered limited range of motion. At most, he manifested or experienced pain when his arm moved, and this pain may have deterred him from certain actions. That is not equivalent to a limitation on movement entirely.

---

[10] Necessarily implying that the *Dawson* petitioner did not have full range of motion in his left shoulder in which he received his intramuscular vaccination.

**Conclusion**

Petitioner has not provided preponderant evidence to establish that he suffered limited range of motion as required to establish a Table SIRVA case. Accordingly, Petitioner's Table SIRVA claim is dismissed. Pursuant to Vaccine Rule 3(d), I will issue a separate Order reassigning this case out of SPU for the resolution of whether Petitioner suffered on Off-Table injury, based upon the record and the fact findings contained in this Ruling.


**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master