# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-893V**
**Filed: June 30, 2026**

| | |
|---|---|
| KYLE BOLICK,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for petitioner.*
*Kimberly Shubert Davey, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

On July 23, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered a shoulder injury related to vaccine administration ("SIRVA") affecting his left shoulder and following an influenza ("flu") vaccination he received on November 8, 2018. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is entitled to compensation.

### I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations,

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a). As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration. § 300aa-14(a), *amended by* 42 C.F.R. § 100.3. In this case, however, it has already been determined that petitioner's condition does not meet the specific requirements of the statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.[3] 42 C.F.R. § 100.3(c).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

---

[3] Specifically, to be considered a "Table SIRVA," a petitioner must show that his/her injury fits the following criteria: (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection; (ii) Pain occurs within the specified time-frame; (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy). 42 CFR § 100.3(c)(10).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence," § 300aa-13(a)(1), meaning that a petitioner must present evidence sufficient to show "that the existence of a fact more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II. Procedural History

Petitioner initially filed an affidavit and medical records marked as Exhibits 1-4. (ECF Nos. 6-7.) Based on the allegations of the petition, the case was assigned to the Chief Special Master as part of the Special Processing Unit or "SPU." (ECF Nos. 11-12.) While the case remained pending in the SPU, petitioner filed additional records marked as Exhibits 5-10. (ECF Nos. 17, 22, 26, 28.)

Thereafter, on October 19, 2023, the Chief Special Master issued Findings of Fact and Conclusions of Law dismissing petitioner's Table SIRVA claim. (ECF No. 45; 2023 WL 8187307 (Fed. Cl. Spec. Mstr. Oct. 19, 2023).) Specifically, the Chief Special Master concluded that the evidence preponderated in favor of a finding that the onset of petitioner's shoulder pain occurred within 48 hours of vaccination, consistent with the requirements for a Table SIRVA; however, he found that petitioner had not preponderantly demonstrated that his clinical presentation included reduced range of motion, which he further found to be a requirement under the SIRVA QAI. (ECF No. 45, pp. 8-13; 2023 WL 8187307, at *5-9.)

Following the dismissal of petitioner's Table claim, the case was reassigned to the undersigned in October of 2023. (ECF Nos. 46-47.) The parties attempted settlement, but were unable to resolve the case informally. Petitioner filed an expert

report by Uma Srikumaran, M.D., supporting a cause-in-fact claim on September 27, 2024. (ECF No. 56; Ex. 11.) Respondent filed a responsive report by Paul Cagle, M.D., on December 2, 2024. (ECF No. 59; Ex. A.) Petitioner then filed a further report by Dr. Srikumaran responding to Dr. Cagle on February 5, 2025. (ECF No. 60; Ex. 28.)

Petitioner filed a motion for a ruling on the written record on May 7, 2025, which is fully briefed. (ECF Nos. 63-64, 66.) I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

## III. Factual History

The following summary of the medical records is carried over from the Chief Special Master's factual summary from the prior Finding of Fact:

- On November 8, 2018, petitioner received the subject flu vaccine, administered to his left deltoid (shoulder), at his place of employment. (Ex. 1, p. 2.)

- On November 24, 2018, petitioner was seen in urgent care, reporting a four-week history of congestion and a cough. (Ex. 10, pp. 90-91.) He was diagnosed with "[a]cute bacterial sinusitis" and prescribed doxycycline and Bromfed-DM to treat his illness. (*Id.* at 92.)

- On November 27, 2018 (19 days post-vaccination), petitioner presented to orthopedist, John Ternes, M.D., with a chief complaint of a three-week history of left shoulder pain. (Ex. 2, p. 12.) Dr. Ternes recorded petitioner's "left lateral shoulder pain secondary to a flu shot injection given on 11/08/2018." (*Id.*) Petitioner's history further indicates that "a few days after the injection he noted continued soreness in the shoulder. The soreness has persisted for him." (*Id.*) Petitioner reported that "[r]eaching overhead and behind his back increases his discomfort." (*Id.*) A "Patient Portal Orthopedic Form" corresponding to petitioner's November 27, 2018 visit, explicitly describes various aspects of petitioner's pain. (*Id.* at 11.) It also provides "experiencing symptoms – Nov 8th 2018." (*Id.*) Dr. Ternes's physical examination findings included: "point tenderness on palpation of the lateral subacromial area but no biceps tendon tenderness. The left shoulder had a full range of motion with no crepitus. Impingement sign was positive. There was no anterior, inferior, or posterior instability of the shoulder." (*Id.* at 12.) Dr. Ternes's impression was left shoulder impingement syndrome. (*Id.*) Dr. Ternes indicated that petitioner's "injection was likely given into the subacromial space and has cause[d] an inflammation of his bursa." (*Id.*) Petitioner was given information pertaining to shoulder bursitis, prescribed diclofenac, and provided with a sheet of exercises to be performed with a Thera-Band, which was also provided. (*Id.*) Administration of a steroid

injection was also discussed, but petitioner wanted to wait on that treatment option. (*Id.*)

- Four months later, on March 28, 2019, petitioner returned to see Dr. Ternes "for follow-up of his left shoulder impingement syndrome." (Ex. 2, p. 7.) Petitioner reported that the prescribed diclofenac medication "help[ed] his discomfort. He is now sleeping better. He still notes an intermittent positional discomfort at the lateral and posterior lateral aspect of his shoulder with overhead reaching and reaching behind his back." (*Id.*) Petitioner further indicated that "he fe[lt] he ha[d] plateaued with still some residual discomfort." (*Id.*) Dr. Ternes's physical examination findings included: "tenderness on palpation of the lateral subacromial area. There was no biceps tendon tenderness. The left shoulder had a full range of motion with subacromial discomfort at the end of forward flexion and internal rotation. Impingement sign was trace positive." (*Id.*) Dr. Ternes's impression remained left shoulder impingement syndrome, and he administered a steroid injection to treat petitioner's left shoulder symptoms. (*Id.*)

- Nearly two months later, on May 23, 2019, petitioner returned to see Dr. Ternes for a follow-up visit regarding his left shoulder pain. (Ex. 2, p. 5.) Dr. Ternes's history provides that petitioner reported that the steroid injection he had received at his prior visit had "completely resolved his shoulder discomfort until about 3 weeks ago." (*Id.*) Petitioner specifically "noted a gradual recurrence of the discomfort in his lateral left shoulder primarily with sleeping and reaching across his body." (*Id.*) Dr. Ternes's physical examination findings noted "tenderness on palpation of the lateral subacromial area but no biceps tendon tenderness. The shoulder had a full . . . active and passive range of motion with subacromial discomfort at the end of forward flexion and internal rotation. There was no crepitus on this range of motion." (*Id.*) Dr. Ternes's impression remained left shoulder impingement syndrome, and it was noted that "it is possible he has a recurrence of the bursitis or a partial-thickness rotator cuff tear." (*Id.*) Various treatment options were discussed, and petitioner decided to try a course of physical therapy and to continue to treat with aspirin. (*Id.*) Additionally, petitioner elected to receive, and was administered, another steroid injection to treat his injury. (*Id.*)

Petitioner also provided a written statement. (Ex. 3.) In this written statement, petitioner describes the onset of his shoulder pain as occurring "immediately" following vaccination. (*Id.* ¶ 4.) He asserts that he had no prior shoulder pain and describes a number of ways in which his post-vaccination pain interfered with his daily life. (*Id.* ¶ 2.) Petitioner indicated that he opted not to pursue physical therapy due to financial strain and family stressors. (*Id.* ¶ 14.)

## IV. Expert Opinions

On petitioner's behalf, Dr. Srikumaran[4] advances a theory of causation consistent with many prior cases in the Vaccine Program. (Ex. 11, pp. 3-8.) Specifically, "injection of vaccine antigen into the subacromial bursa [can lead] to a 'robust local immune and inflammatory response' leading to pathology of the subacromial space, biceps tendon, glenohumeral joint, and capsulitis." (*Id*. at 3 (quoting Marko Bodor & Enoch Montalvo, *Vaccination-Related Shoulder Dysfunction*, 25 VACCINE 585 (2007) (Ex. 16)); *see also* S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010) (Ex. 14); L.H. Martín Arias et al., *Risk of Bursitis and Other Injuries and Dysfunctions of the Shoulder Following Vaccinations*, 35 VACCINE 4870 (2017) (Ex. 13).) In petitioner's own case, Dr. Srikumaran opines that he suffered bursitis and subacromial impingement syndrome, consistent with this theory of causation. (*Id*. at 8.) Moreover, he notes that petitioner's treating physician, Dr. Ternes, likewise felt that petitioner's presentation was consistent with inflammation of the bursa due to injection into the subacromial space. (*Id*. (citing Ex. 2, p.12).) Consistent with the Chief Special Master's prior finding of fact, Dr. Srikumaran opines that the onset of shoulder pain on the day of petitioner's vaccination is consistent with the literature supporting his theory of causation. (*Id.* at 10.)

Regarding the absence of reduced range of motion, Dr. Srikumaran raises three points: First, petitioner subjectively reported difficulties consistent with reduced range of motion, such as inability to lift or extend his arm or play golf. (Ex. 11, p. 9 (citing Ex. 3, pp. 2-4; Ex. 2, p. 12).) Such subjective reports are valuable and help to guide treatment. (*Id*. at 10.) Second, many of petitioner's physical exams were unclear in that they failed to adequately differentiate between active (patient moves the arm) and passive (physician moves the arm) range of motion. (*Id.* (citing Ex. 2, pp. 5, 7, 12).) Notable to this point, Dr. Srikumaran notes that petitioner's final exam did document full

[4] Dr. Srikumaran received his medical degree from Johns Hopkins University School of Medicine in 2005, before going on to complete an internship in general and orthopaedic surgery and a residency in orthopaedic surgery at Johns Hopkins Hospital in 2006 and 2010, respectively. (Ex. 12, p. 1.) From there, Dr. Srikumaran went on to complete two additional fellowships: a shoulder surgery fellowship and an international shoulder fellowship. (*Id.*) In 2011, Dr. Srikumaran accepted positions as the assistant team physician for the Baltimore Orioles, as an assistant professor in the Department of Orthopaedic Surgery at Johns Hopkins University School of Medicine, and as an attending physician at Johns Hopkins Hospital, Howard County Medical Center. (*Id.* at 1-2.) He was elevated to associate professor of orthopaedic surgery at Johns Hopkins University School of Medicine in 2019. (*Id.*) He also serves as Vice Chair of Quality, Safety, and Service and the director of the shoulder fellowship in the Department of Orthopaedic Surgery at Johns Hopkins University School of Medicine. (*Id.*) He is board certified in orthopaedic surgery, and he maintains an active medical license in Maryland. (Ex. 11, p. 1.) He is also a fellow of the American Academy of Orthopaedic Surgery, a fellow of the American Orthopaedic Association, and an active member of the American Shoulder and Elbow Surgeons. (*Id.*) Dr. Srikumaran evaluates and treats approximately 2500-3000 patients for shoulder issues and performs around 400-500 shoulder surgeries, annually, and he has treated approximately 10-12 patients with shoulder dysfunction after vaccination in the last five years. (*Id.*) In his research capacity, Dr. Srikumaran has authored 142 original research articles, 10 review articles, 7 case reports, 51 book chapters and monographs, 3 books, 6 editorials, and 6 guidelines/protocols, consensus statements, expert opinions, and consortium articles. (Ex. 12, pp. 2-14.)

active and passive range of motion, but then noted the presence of subacromial discomfort at the end of forward flexion and internal rotation and petitioner was advised to limit overhead activity. (*Id*. (citing Ex. 2, pp. 5, 7).) Third, bursitis, which is associated with SIRVA, need not present with limited range of motion, especially if it is treated early and effectively. In such situations pain may be provoked only with impingement maneuvers. (*Id*. at 9-10.)

In response, Dr. Cagle[5] contends on respondent's behalf that there is inadequate evidence to support the presence of any shoulder pathology. (Ex. A, pp. 2-3.) He does not contest Dr. Srikumaran's theory of causation, but suggests that it cannot be applied without a diagnosis. (*Id*. at 3.) In that regard, Dr. Cagle stresses that the only physical exam finding that would support such a conclusion was a positive impingement sign; however, the specific impingement test is not indicated. (*Id.* at 2-3.) Assuming *arguendo* that the record refers to either a Neer's or Hawkin's test, the two most commonly utilized tests, such tests lack sensitivity and specificity. (*Id*. at 3.) Specifically, a recent study showed that "for every 100 people who undergo a Neer's test, 47 will have a false positive result, and for every 100 people who undergo a Hawkins' maneuver, 41 will have a false positive result." (*Id*. (citing E J Hegedus et al., *Physical Examination Tests of the Shoulder: A Systematic Review with Meta-Analysis of Individual Tests*, 42 BRIT. J. SPORTS MED. 80 (2008) (Ex. A, Tab 2)).) Therefore, Dr. Cagle opines that "it is not reasonable to confirm a shoulder injury from these tests or to make a reliable shoulder diagnosis based on any one single physical examination test in isolation." (*Id*.) By contrast, the literature cited by Dr. Srikumaran correlates shoulder weakness and reduced range of motion to SIRVA and further underscores that additional diagnostic work up, such as MRI, can be achieved. (*Id*. at 4.)

Dr. Srikumaran agrees with Dr. Cagle's assumption that the impingement test performed on petitioner was likely either a Neer's or Hawkin's test; however, he stresses that his opinion is not based solely on that exam finding. (Ex. 28, p. 1.) In addition to the documented positive impingement test, Dr. Srikumaran notes that petitioner reported pain in the lateral subacromial area (Ex. 2, p. 12), as well as pain in the lateral and posterior aspect of his shoulder with overhead reaching (*Id*. at 7), and tenderness to palpation in the lateral shoulder above the greater tuberosity, which is indicative of pathology in the subacromial bursa. (Ex. 28, p. 1.) Moreover, he experienced improvement with a subacromial steroid injection. (*Id*.) Even without further

---

[5] Dr. Cagle received his medical degree from Loyola University Chicago Stritch School of Medicine in 2008, before going on to complete an orthopaedic surgery residency at the University of Minnesota Academic Health Center and Medical School in 2013, followed by a shoulder and elbow fellowship at Mount Sinai Hospital and a shoulder fellowship at Private Hospital Jean Mermoz/Centre Orthopaedic Santy in 2014. (Ex. B, p. 1.) From there, Dr. Cagle accepted a position as an assistant professor in the Department of Orthopaedic Surgery at the Southern Illinois University School of Medicine. (*Id.*) He was elevated to associate professor at the Leni & Peter May Department of Orthopedics at Icahn School of Medicine at Mount Sinai in 2016. (*Id.*) Dr. Cagle is board certified in orthopaedic surgery. (Ex. A, p. 1.) He clinical practice "focuses on the shoulder, representing approximately 95% or more of the patients and pathology [he] treat[s]." (*Id.* at 1-2.) He has authored 102 publications, 8 book chapters, 30 podium presentations, and 27 poster presentations. (Ex. B, pp. 4-24.)

confirmation from MRI, Dr. Srikumaran opines that these findings collectively indicate that bursitis is the most likely diagnosis and, further, suggests that he is aware of no other diagnoses, other than bursitis and impingement syndrome, that would account for this conglomeration of symptoms. (*Id*.)

## V. Analysis

### a. *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," showing that the subject vaccine can cause the type of injury alleged. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006)). Such a theory need only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory. While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49). That is, although petitioners are not required to prove their theories in any one way, they must in all events support their proffered theory with sound and reliable scientific explanation, *Boatmon*, 941 F.3d at 1359, and provide evidence that establishes on balance that the vaccine at issue can more likely than not cause the injury at issue, *Cerrone v. Sec'y of Health & Human Servs.*, 146 F.4th 1113, 1120-23 (Fed. Cir. 2025).

In his briefing, respondent devotes significant attention to the question of whether petitioner has demonstrated a cognizable injury. In particular, respondent argues that petitioner must preponderantly establish a medically recognized injury. (ECF No. 64, p. 5 (citing *Broekelschen v. Sec'y of Health & Human Servs*., 618 F.3d 1339, 1346 (Fed. Cir. 2010); *Lombardi v. Sec'y of Health & Human Servs*., 656 F.3d 1343, 1352 (Fed. Cir. 2011).) However, he argues that petitioner has instead sought to argue under *Althen* prong one that he can prevail on the basis of SIRVA, which respondent contends is merely a term of art created by his own rulemaking. (*Id*. at 5-6 (citing 42 C.F.R. § 100.3(c)(10).) In that regard, respondent stresses Dr. Cagle's opinion that petitioner failed to establish any injury at all. (*Id*. at 6-8.) Respondent's argument under *Althen* prong one is essentially an extension of this line of reasoning. He adopts Dr. Cagle's opinion that "the theories of causation discussed in Dr. Srikumaran's report simply cannot be applied without a shoulder diagnosis" (*Id*. at 10 (quoting Ex. A, p. 3)) and adds: "To the extent that petitioner and his expert half-heartedly assert that petitioner

suffered from bursitis or impingement syndrome, Dr. Srikumaran did not present a causal theory for those specific diagnoses" (*Id*. at 10-11).

Consistent with respondent's view, while I have repeatedly held that petitioners may rely on the available body of SIRVA literature to support a theory of causation, *e.g.*, *Morris v. Sec'y of Health & Human Servs.*, No. 19-1570V, 2023 WL 5092691, at *6 (Fed. Cl. Spec. Mstr. July 11, 2023), I have also previously explained that to permit a petitioner to simply present the fact of the Table Injury of SIRVA as a theory of causation where that petitioner cannot meet the accompanying QAI criteria "would be to expand the causal presumption afforded by the Vaccine Injury Table," *Kelly v. Sec'y of Health & Human Servs.*, No. 17-1918V, 2022 WL 1144997, at *21 (Fed. Cl. Spec. Mstr. Mar. 24, 2022). However, "[t]he Act relaxes proof of causation for injuries satisfying the Table in § 300aa–14, but does not relax proof of causation in fact for non-Table injuries." *Grant v. Sec'y of Health & Human Servs*., 956 F.2d 1144, 1148 (Fed. Cir. 1992) (explaining with respect to cause-in-fact claims that "[s]imple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner"). Thus, as respondent suggests, it is well understood in the Program that a petitioner "must specify his vaccine-related injury and shoulder the burden of proof on causation." *Broekelschen*, 618 F.3d at 1346. In order to present an "injury" cognizable under the Vaccine Act, "[m]edical recognition of the injury claimed is critical" and petitioner must assert "more than just a symptom or manifestation of an unknown injury." *Id.* at 1349.

In this case, however, respondent is unpersuasive in contending with respect to *Althen* prong one that Dr. Srikumaran's causal theory was not specific to either bursitis or impingement syndrome. While it is true that Dr. Srikumaran's report discusses a number of shoulder conditions, he was very clear in opining that injection of vaccine antigen into the subacromial space can inflame bursal tissue, *i.e*. cause bursitis. (Ex. 11, pp. 3-4 (citing Bodor & Montalvo, *supra*, at Ex. 16; Atanasoff et al., *supra*, at Ex. 14; Arias et al., *supra*, at Ex. 13; Julia R Hirsiger et al., *Chronic Inflammation and Extracellular Matrix-Specific Autoimmunity Following Inadvertent Periarticular Influenza Vaccination*, 124 J. AUTOIMMUNITY 102714 (2021) (Ex. 24)).) He further identifies impingement syndrome as a potential clinical indicator of bursitis. (*Id*. at 10.) This theory is unchallenged. As respondent quotes, his own expert confined his critique to challenging the applicability of this theory to petitioner's case. (Ex. A, p. 3 (opining that "the theories of causation discussed in Dr. Srikumaran's report simply cannot be applied without a shoulder diagnosis").) Dr. Cagle never disputed that a vaccine injection can cause bursitis and/or impingement syndrome and, instead, noted that "Dr. Srikumaran does a fine job of summarizing the available literature." (*Id*.) Whether there is sufficient clinical evidence to support Dr. Srikumarn's application of this theory to this particular case is addressed under *Althen* prongs two and three.

Accordingly, petitioner has met his preponderant burden of proof under *Althen* prong one.

### b. *Althen* prong three

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.*; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. denied sub nom. C.K. v. Sec'y of Health & Human Servs.*, 113 Fed. Cl. 757 (2013), *aff'd sub nom. Koehn v. Sec'y of Health & Human Servs.*, 773 F.3d 1239 (Fed. Cir. 2014).

Although the Chief Special Master already concluded that petitioner experienced an onset of shoulder pain within 48 hours of his vaccination (ECF No. 45, pp. 8-9; 2023 WL 8187307, at *5-6), respondent contends that the relevant period for a causal inference based on the literature cited by Dr. Srikumaran is "rapid," "immediate," or within one-day of vaccination. (ECF No. 64, p. 12.) According to respondent, the literature cited by Dr. Srikumaran supports onset of shoulder pain occurring within one day of vaccination among "93% of patients." (*Id*. (citing Ex. 11, p. 4).) This refers to the study by Atanasoff et al. (Atanasoff et al., *supra*, at Ex. 14, p. 2.) Importantly, however, while the Atanasoff study was seminal to the creation of the SIRVA concept, it is a case series of only 13 patients. (*Id.*) By contrast, Dr. Srikumaran also cited a paper by Hesse et al., which included a population-based cohort study that detected an increased risk of bursitis – the specific condition theorized to be susceptible to vaccine causation under *Althen* prong one – with symptom onset occurring within the three days after vaccination. (Elisabeth M. Hesse et al., *Risk of Subdeltoid Bursitis After Influenza Vaccination: A Population-Based Cohort Study*, 173 ANNALS INTERNAL MED. 253 (2020) (Ex. 22, p. 4).)

Having considered respondent's arguments as to the timing of onset of petitioner's shoulder pain, I now adopt the Chief Special Master's finding as to onset as my own. Moreover, in light of the above, I further find that this onset supports a causal inference based on Dr. Srikumaran's theory of causation.

Accordingly, petitioner has met his preponderant burden of proof under *Althen* prong three.

### c. *Althen* prong two

The second *Althen* prong requires proof of a logical sequence of cause and effect, which is usually supported by facts derived from a vacinee's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). Medical records are generally viewed as particularly trustworthy evidence. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master. *See* § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009) ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted."). A petitioner may support a cause-in-fact claim through either medical records or expert medical opinion. § 300aa-13(a). The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

Here, petitioner's treating orthopedist, Dr. Ternes, diagnosed petitioner with impingement syndrome and further documented the opinion that "the injection was likely given into the subacromial space and has cause[d] an inflammation of his bursa." (Ex. 2, p. 12.) Petitioner "was given an instruction sheet on shoulder bursitis." (*Id*.) This is clear treating physician support for petitioner's injury claim. Moreover, Dr. Srikumaran further endorses this conclusion via his expert opinion, which explains that bursitis can manifest as pain with impingement maneuvers. (Exs. 11, 28.)

Ordinarily, treating physician opinions, though not binding, are entitled to significant weight. *Capizzano*, 440 F.3d at 1326 (noting that medical records are favored in this Program as "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'" (alteration in original) (quoting *Althen*, 418 F.3d at 1280)). However, respondent argues that the medical records are not sufficient to preponderantly demonstrate that petitioner suffered a shoulder injury. (ECF No. 64, p. 11.) Respondent stresses that over the course of three orthopedic examinations, petitioner's findings were "largely normal," and, given Dr. Cagle's explanation of the lack of accuracy of impingement testing, Dr. Ternes's and Dr. Srikumaran's opinions are based only on subjective reporting and temporal association. (*Id*. at 11-12.) There are several issues with respondent's view.

First, respondent and Dr. Cagle appear to overstate the limitations of impingement testing. It is reasonable for Dr. Cagle to suggest both that impingement testing should be viewed cautiously and that it would not in isolation reliably support a diagnosis. (Ex. A, p. 3.) However, I am not persuaded that the specific study cited by

Dr. Cagle supports the complete unreliability of these tests as he seems to suggest. As Dr. Cagle indicates, Hegedus et al. found, based on a literature review and pooled analysis, that neither the Neer nor Hawkin's tests had diagnostic utility for impingement. (Hegedus et al., *supra*, at Ex. A, Tab 2, p. 4.) Ultimately, however, while the authors found that these two specific tests "have no discriminatory ability for shoulder diagnosis," they noted that such tests may nonetheless "serve as a screen," meaning a negative result would rule out pathology while a positive result would warrant further testing. (*Id*. at 11.) Moreover, the authors explain that four out of the six studies they reviewed regarding the diagnostic accuracy of impingement testing were of "lower design/reporting quality." (*Id.* at 4.) Indeed, while the authors noted that "[o]rthopaedic special tests (OSTs) are used extensively in clinical practice to detect shoulder pathology," "[t]he literature examining the diagnostic accuracy of OSTs is generally of poor quality." (*Id*. at 11.) Thus, given the shortcomings of prior studies, they cautioned that their "recommendations should be viewed as a guide and not an absolute." (*Id*. at 12.) Otherwise, the authors note that OSTs are an "integral" part of orthopedic physical examination, which, along with patient history, "has traditionally been a cornerstone of the diagnostic process." (*Id*. at 1.) Thus, while I accept that impingement tests, standing alone, do not support any specific diagnosis, I do not agree that the medical record documentation of positive impingement signs in this case should be doubted as evidence of shoulder pathology, absent any other confounding considerations.

Second, petitioner's initial diagnosis by Dr. Ternes was supported by more than just the positive impingement signs. Dr. Ternes's medical record also documents a complete history that identified an acute onset of shoulder pain following injection, a specific report of pain affecting the anterior subacromial area, difficulty with overhead movement, an absence of numbness and tingling, and an absence of any prior history of left shoulder problems. (Ex. 2, p. 12.) Furthermore, Dr. Ternes ruled out arthritic changes or fracture via x-ray and observed on physical exam that petitioner had tenderness to palpation at the lateral subacromial area, but not at the sternoclavicular joint, the AC joint, or the biceps tendon. (*Id*.) Respondent is correct that patient history constitutes a subjective account, but this does not render it immaterial. *E.g.*, *James-Cornelius v. Sec'y of Health & Human Servs*., 984 F.3d 1374, 1380 (Fed. Cir. 2021) (noting that "for many medical symptoms or events . . . the patient's or a parent's testimony may be the best, or only, direct evidence of their occurrence"). As noted above, the literature filed by respondent indicates that both history and physical exam are considered important to orthopedic diagnosis. (Hegedus et al., *supra*, Ex. A, Tab 2, p. 1.) Dr. Cagle's competing opinion, which is essentially limited to questioning the diagnostic significance of impingement testing, is inadequate to call into question Dr. Ternes's overall clinical judgment based on the available history, as well as his various clinical findings, both positive and negative. Notable in that regard, Dr. Cagle conspicuously provides no competing assessment of the reason for petitioner's symptoms, while Dr. Srikumaran opines that no other diagnosis can readily account for petitioner's overall presentation. Respondent stresses that petitioner did not have reduced range of motion, but this fact was known to Dr. Ternes. Accordingly, respondent has not demonstrated that Dr. Ternes misapprehended that aspect of petitioner's presentation.

Third, respondent is critical of Dr. Ternes for relying in significant part on temporal proximity. However, while temporal proximity is not enough on its own, it is still probative given that petitioner has met his burden of proof under *Althen* prongs one and three. *Capizzano*, 440 F.3d at 1326. Thus, treating physician opinions that rely in significant part on temporality can be credited. *Id*. Ultimately, given that respondent has not raised any question as to the genuineness of petitioner's treatment seeking, respondent's defense fails to meaningfully grapple with the existence of petitioner's symptoms. *Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007) (concluding that petitioners are permitted to rely in part on elimination of alternative causes to meet their initial burden of proof). While both respondent and Dr. Cagle suggest that further diagnostic work up, such as MRI, could have been informative (ECF No. 64, pp. 11-12; Ex. A, p. 4), Dr. Cagle agreed that a robust workup was not appropriate in petitioner's case (Ex. A, p. 4; *see also* Hegedus et al., *supra*, Ex. A, Tab 2, p. 1 (explaining that "[d]iagnosis based on physical findings is important to determine a treatment path and because the ability to correctly diagnose the source of shoulder pain can save the patient from further diagnostic tests that are more costly, painful or inconvenient"). In that regard, preferring Dr. Cagle's view would effectively penalize petitioner for having suffered only a mild and ultimately treatable condition.

Ultimately, this is a close case. As noted above, it is not entirely unreasonable for respondent to question the diagnostic value of impingement testing. And, of course, petitioner bears the initial burden of proof. Indeed, I have in multiple prior cases found that positive signs of impingement were inadequate to evidence a post-vaccinal injury where treating physician opinion favored another explanation. *Pulsipher v. Sec'y of Health & Human Servs.*, No. 21-2133V, 2025 WL 1364203, at *11 (Fed. Cl. Spec. Mstr. Apr. 24, 2025), *mot. for rev. denied*, 179 Fed. Cl. 268 (2025); *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *17-18 (Fed. Cl. Spec. Mstr. Apr. 6, 2023); *Truett v. Sec'y of Health & Human Servs.*, No. 17-1772V, 2022 WL 17348386, at *17 (Fed. Cl. Spec. Mstr. Nov. 1, 2022). And, as explained under *Althen* prong one, a cause-in-fact showing cannot merely seek to expand or side-step the requirements of a Table SIRVA. *Kelly*, 2022 WL 1144997, at *21. Given the minimal objective evidence available on this record, Dr. Srikumaran would not likely have been persuasive if his opinion had been inconsistent with the impression of the treating physician or if supportive treating physician opinion were lacking. In this case, however, the treating orthopedist explicitly diagnosed bursitis and his clinical impression clearly implicates petitioner's vaccination as a cause of his condition. Moreover, petitioner has affirmatively demonstrated under *Althen* prongs one and three that vaccines can cause bursitis and that the onset of petitioner's own bursitis occurred during a period from which a causal inference can be made. Respondent, though he notes the supporting evidence is thin, has not presented any data that actually confounds that clinical assessment. On this record, I am not persuaded that the treating orthopedist's opinion should be set aside in favor of Dr. Cagle's view, which treats petitioner's symptoms as essentially mysterious.

Accordingly, petitioner has met his preponderant burden of proof under *Althen* prong two.

### d. Factor Unrelated to Vaccination

Once petitioner has met his own prima facie burden of proof, respondent may still demonstrate by a preponderance of evidence that the injury was nonetheless caused by a factor unrelated to the vaccination. § 300aa-13(a)(1)(B). In order to meet his burden of proof, respondent must demonstrate by preponderant evidence "that a particular agent or condition (or multiple agents/conditions) unrelated to the vaccine was in fact the sole cause (thus excluding the vaccine as a substantial factor)." *de Bazan*, 539 F.3d at 1354 (emphasis omitted). In this case, however, respondent has not advanced any such argument.

## VI. Conclusion

After weighing the evidence, and considering the record as a whole, I find that petitioner has preponderantly demonstrated that he is entitled to compensation for a shoulder injury caused-in-fact by his November 8, 2018 flu vaccination. A separate damages order will be issued.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master